## BECKSTEAD v. FIRST NATIONAL BANK.
(No. 905; Decided December 30th, 1918; 176 Pac. 726.)

Appeal and Error—Matters Reviewable—Motion for New Trial —Estoppel—Payment—Mortgages—Rights of Third Persons.

1. A party plaintiff against whom judgment was rendered cannot complain of error below, where he filed no motion· for new trial, although another plaintiff filed such a motion and brought error.

2. Where sheep of mortgagor of land were transferred to first mortgagee by bill of sale, stating they were taken at a price in excess of indebtedness, with intent to prevent other creditors from attaching the surplus, first mortgagee could not thereafter claim, as against a second mortgagee, that the price stated was not the true consideration, and that the full amount thereof was not applied on the first mortgagee's indebtedness, although the sheep sold on the market for less than the first mortgagee's claim.

Error to the District Court, Sweetwater County, Hon. William C. Mentzer, Judge.

Action by Frank Beckstead, et al. v. First National Bank of Evanston, Wyoming, et al. Judgment for defendants, and plaintiffs bring error.

*T. S. Taliaferro, Jr.,* and *W. A. Muir* for plaintiff in error, Morris State Bank.

The findings and judgment failed to distinguish the position of the plaintiff bank from that of the Becksteads; the judgment should have provided that before the temporary injunction was dissolved, or the foreclosure permitted, defendant bank should liquidate the indebtedness due the plaintiff bank. The trial court erred in finding that no expenses on account of foreclosure were chargeable against the plaintiff Beckstead. It was made clear by the evidence that representatives of defendant bank connived to prevent the Green River Mercantile Company from realizing on its claim as a junior incumbrancer. The most usual application of the doctrine of estoppel *in pais* arises from the misrepresentation or concealment of material facts on the part of the person to be estopped. (Am. & Eng. Enc., Vol. 11, p. 421.) The defendant bank having made the representation that the purchase price of the sheep was $23,500.00 will be precluded from contesting its truth. An essential element of estoppel by misrepresentation or concealment is that one party should have relied upon the conduct of the other and induced by it to act or to refrain from acting so that he will be substantially injured if the other party should be allowed to repudiate his action. (Am. & Eng. Enc., Vol. 11, p. 436.)

*P. W. Spaulding,* for defendant in error, First National Bank of Evanston.

The State Bank of Green River was formerly the Morris State Bank. The change in name was suggested and agreed to by the parties during the trial. The plaintiff bank having relied upon the principle of estoppel waives all other questions, if such there be. (Pearce v. Holn (Wyo.), 152 Pac. 786.) Only one of the plaintiffs moved for a new trial, but all three of the original plaintiffs bring error. The brief filed is on behalf of but one of the plaintiffs in error, to-wit, the plaintiff bank. A consideration recited in a bill of sale is always opened to exception. (Davis Photo Co. v. Jewelry Co., 19 Am. Cas. 541.) There is no evidence of a substantial injury to the plaintiff bank, or the Green River Mercan-

tile Company upon which to base the principle of estoppel. The action is brought as an equitable action, but defendant bank has failed to show equities existing in its favor. He who comes into equity must do equity, so that if the Becksteads and the plaintiff bank can ask a court to cancel the mortgages held by defendant bank, they must show payment in full or offer payment in full. (Corpus Juris, Vol. 1, p. 539.) It being equitable that the whole debt can be paid, it cannot be inequitable to extinguish first those debts for which the security is most precarious. (Jones Chat. Mortgage, 5th Ed., Sec. 639; Field v. Holland, 10 U. S. 28, 3 L. Ed. 136.) The sheep having been sold, the proceeds should be applied first to the mortgages on the sheep and then to the notes secured by the mortgages on the lands.

*T. S. Taliaferro, Jr.,* and *W. A. Muir,* for plaintiffs in error, in reply.

The trial court erred in not applying the doctrine of estoppel to the evidence of defendant in error in seeking to substitute another consideration for the bill of sale than the $23,500.00 stated therein. (Union Bank v. Securities Company, 157 N. W. 510; Ensel v. Levy, et al., 19 N. E. 597; Marling v. Fitzgerald, 138 Wis. 93, 121 N. W. 388, 131 A. S. R. 1003.) The trial court erred in fixing a different consideration for the bill of sale than that expressed therein. The trial court erred in refusing to allow the sum of $118.50 for the care and keep of the six head of horses. The trial court erred in charging the account of Beckstead for services in accompanying the sheep to market.

BEARD, JUSTICE.

This action was brought by the plaintiffs in error against the defendants in error to enjoin the foreclosure by notice and sale of two mortgages upon real estate, given by the plaintiffs, Beckstead, to the defendant bank, alleging that the debts secured thereby had been paid. Upon the trial the district court found and adjudged that there was due said bank from the plaintiffs, Frank Beckstead and Z. Mack Beckstead, upon said indebtedness, $3,045.15, with interest

from October 2, 1915, $44.88 for advertising notice of foreclosure, and $200.00 attorneys' fees in the foreclosure proceedings; decreed said mortgages to be a prior and superior lien upon the real estate to a mortgage given thereon by said Frank and Z. Mack Beckstead to The Green River Mercantile Company and assigned to the plaintiff bank, dissolved the temporary injunction theretofore issued in the action, found generally in favor of defendants and rendered judgment against plaintiffs for costs. From those findings, judgment and decree, plaintiffs bring error.

There is not much controversy as to the material facts in the case. It is admitted that on July 7, 1915, the Becksteads were indebted to the defendant bank in the sum of $17,500.00, which was secured by a chattel mortgage on sheep, horses, wagons and camp outfit used in running the sheep, and were also indebted to said bank on said date in the further sum of $5,000.00, secured by real estate mortgages. That their total indebtedness to said bank on October 1, 1915, was $22,915.00. On that day Frank Beckstead and Z. Mack Beckstead, being indebted to The Green River Mercantile Company in the sum of $2,105.35, and in consideration of a further credit of $500.00, gave their promissory note, secured by mortgage on the real estate in question, for the sum of $2,605.35, which was afterwards assigned to the plaintiff bank and remains unpaid. September 11, 1915, the defendant bank, in writing, appointed John H. Ward its agent to take possession of the property described in the chattel mortgage and to sell the same as provided by law. Either that day or within a day or two thereafter Ward and the cashier of the defendant bank went to the Beck ranch when it was agreed that the Becksteads shou1 ten days in which to raise $21,500.00, which the agreed to accept in full payment of the bank's claim i paid within that time. Ward did not take possession of the mortgaged property. Nothing further was done until October 1, 1915, when the cashier met the Becksteads in Green River, Wyoming, at which time what was done can best be stated by quoting his testimony given on the trial, as follows:

"I met Mr. Beckstead about 10 o'clock in the morning. We went into the hotel in my room. I asked him, I think, if he succeeded in raising the money,—said he hadn't. I asked him what he was going to do with the sheep going to be sold, if he had any way of getting rid of them to the best advantage. He said he wanted to sell them in Omaha. I asked him if he was aware that several attachments were threatened. He said he was. I explained to him Mr. Taliaferro had threatened to attach the sheep. Ivan Jones from Kemmerer had been down there to represent a debt at Kemmerer of something over a thousand dollars, and Blyth & Fargo Company was getting anxious here, he owed them something like $1,400. And he said that he realized if the foreclosure proceeded that these attachments would be served, that they would clean up everything that he had. And we talked it over on lines of the best thing to do; wanted to know if there was any way of protecting him; I told him only way we could do to take title of the sheep, if we proceeded to foreclose they had a right to make attachments. We decided one way to get title was to take a bill of sale. I suggested to Mr. Beckstead if we took a bill of sale that I would expect him to protect the Blyth & Fargo Company at Evanston, make a substantial payment on their debt. This he hesitated to do for a while, and I asked him again if he would agree to that, finally said he would agree to that, I said: all right, I will take your word. So we proceeded to draw up the bill of sale. The bill of sale was drawn for the consideration of $22,500 and that was for the sheep. Mr. Beckstead insisted that we should also put the bucks and horses in there because he wanted those also protected. I says: Wouldn't make any difference to put them in, so we put them in. Mr. Beckstead signed the bill of sale there at the room. Went out on the street and we picked up Mr. Ward, went out to the sheep camp in order for Mack Beckstead to sign the bill of sale. It was fully agreed with Mr. Beckstead and myself that the bank would only want the face of the notes and the interest and any overplus would go to him. * * * He went over to him (Mack

Beckstead), they returned in a few minutes. Mr. Mack Beckstead seemed to be very much pleased with the arrangement that had been made and he signed the bill of sale. * * * I think I gave Mr. Beckstead a dollar and Mr. Mack Beckstead a nickle, which was all I had left; proceeded over the brow of the hill, the sheep were browsing along on the side of the hill; told Mr. Frank Beckstead the sheep looked well, ought to bring a good price on the market. I says: It seems a shame to ship them out of the country. He says: I realize that—I want them to go, listen to nothing else that the whole business is shipped out of the country. So I told him that would be probably what we would have to do with them. Got to taling values. He says: Great deal more sheep than the bill of sale calls for. I says: I think there are, certainly do. I says: That will make it bad for us getting the sheep shipped to Omaha and have the money attached down there and tied up a thousand miles away, make a great deal of trouble for the bank, and it was suggested——" (Objection by plaintiff.) By the court: "State what was said and done there, as nearly as you can, Mr. Bradbury." "I am not sure whether I suggested to raise the price of the sheep, but I am inclined to think I did, wanted to be careful to see that there was no overplus under the bill of sale, that there would be any attachments down there. He said that was what he wanted to do. We agreed to raise the bill of sale a thousand dollars. We returned to town, and that evening Mack Beckstead came in and a new bill of sale was made for $23,500, and Mr. Ward said something about he didn't know whether it was legal or not. I told him I thought it was all right, so far as value was concerned didn't care anything about that, so long as we had enough to avoid the attachments. Mack signed the bill of sale; the bill of sale that we had made previous to this was torn up and thrown into the waste basket." On cross-examination, witness stated:

"The value in the bill of sale wasn't considered at all. Frank understood it at that time, and he understands it now; never agreed to pay him the value of the bill of sale; at no

time had we agreed to pay him the value that the bill of sale called for; that the bill of sale was given for the sole reason that the bank should gain the title of the sheep, and if there was any overplus that he would get it, and if he would do the right thing that he would take care of Blyth & Fargo indebtedness, which had been standing, I think, longer than any of the other accounts."

A letter written by Mr. Taliaferro, attorney for plaintiffs, to Frank Beckstead, dated November 12, 1915, was introduced in evidence, in which the indebtedness of the Becksteads to the defendant bank was stated to be $22,500, with interest from July 7, 1915; "that the purchase price of the sheep and camp outfit, horses and bucks and equipment was $23,500." Mr. Bradbury, the cashier of defendant bank, testified, "He (Taliaferro) called his stenographer and told her to write the letter you see here; didn't pay any attention, and when he finished he said: I want you to read this letter. I told him I didn't care to read the letter. He says: You think it is about what the case is? I says: Somewhere near. He says: Want you to read it. I told him I didn't care to. I walked out of the room before the letter was out of the machine. Q. What did you tell him regarding those figures in the bill of sale? A. Don't know that I told him anything, we had accepted the bill of sale. Q. With the figures in it? A. Yes, didn't necessarily mean we would pay it, though."

At the time this action was commenced, April 11, 1916, the defendant bank was proceeding to foreclose the two real estate mortgages by advertisement and sale, the defendant McCourt acting as its agent to conduct the sale.

At the time of the execution of the bill of sale the amount of the Becksteads' indebtedness to the defendant bank secured by the chattel mortgage was $17,500, with eight per cent. per annum interest from July 7, 1915. From the testimony of the cashier of the defendant bank, above set out, it is too clear to admit of argument that the purpose in taking the bill of sale was to prevent other known creditors of the Becksteads from attaching the property. He further

distinctly stated in his testimony that "it was fully agreed with Mr. Beckstead and myself, that the bank would only want the face of the notes and the interest and any overplus would go to him." And again, "The bill of sale was given for the sole reason that the bank should gain the title of the sheep, and if there was any overplus that he would get it."

Most of the sheep were shipped to Omaha, Nebraska, and sold by defendant bank and some of the other property included in the bill of sale was sold at private sale. The amount realized from the sales was insufficient to pay the Becksteads' indebtedness to said bank; and the court so found as herein above stated.

The Becksteads are not in a position to complain of that finding for the reason, if for no other, that they filed no motion for a new trial. The plaintiff bank, however, stands in a different situation. In the circumstances shown by the evidence of the defendant bank, the plaintiff bank had a right to believe that the considerations stated in the bill of sale, $23,500, less the liens of the herders, the taxes and other legitimate expenses incurred up to that time, would be credited on the indebtedness. The defendant bank having represented that it had taken over the property for that amount with the intent and for the purpose, as stated by its cashier, of preventing other known creditors of the Becksteads from attaching the property, and agreeing that any surplus arising from the transaction should go to the Becksteads, cannot be heard in a court of equity to claim between it and those creditors that that was not the true consideration. As between the banks, the defendant bank is entitled to a superior lien on the real estate for the difference between $23,500, the consideration stated in the bill of sale, and the following accounts:

```
Due the bank Oct. 1, 1915............$22,915.00
Herders' liens .....................  1,120.71
Taxes .............................    151.62
Attorneys' fees ....................    200.00
Advertising .......................      44.88
    Total.........................$24,432.21
Less .............................. 23,500.00
                                   $   932.21
```

with interest on said sum of $932.21 from October 1, 1915. Subject to that lien the plaintiff bank is entitled to a lien on said real estate for the amount due upon its claim secured by mortgage thereon, superior to the balance due the defendant bank or its mortgage. The cause will be remanded to the district court with directions to modify its judgment and decree as above indicated. Plaintiff in error bank to recover its costs in this court.

*Modified and remanded with directions.*

Potter, C. J., concurs.

Blydenburgh, J., being ill, did not participate.